# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 11, 2014

## STATE OF TENNESSEE v. JONATHAN DOWNEY

**Appeal from the Circuit Court for Humphreys County**
**No. 12044    Larry Wallace, Judge**

**No. M2013-01099-CCA-R3-CD - Filed February 28, 2014**

Jonathan Downey ("the Defendant") was convicted by a jury of first degree felony murder, criminally negligent homicide, and aggravated burglary. The trial court sentenced the Defendant to life imprisonment for the felony murder and then merged the latter two convictions with the felony murder conviction. In this direct appeal, the Defendant contends that the evidence was not sufficient to support his conviction of first degree felony murder. The State asks this Court to reverse the trial court's merger of the aggravated burglary conviction. After a thorough review of the record and the applicable law, we affirm the Defendant's conviction of first degree felony murder. We order the trial court to reinstate the Defendant's conviction of aggravated burglary and remand this matter for sentencing on that conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Gregory D. Smith (on appeal) and Edward E. DeWerff (at trial), Clarksville, Tennessee, for the appellant, Jonathan Downey.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Carey Thompson and Craig Monsue, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with one count of first degree premeditated murder, one count of first degree felony murder, and one count of aggravated burglary. Also charged were Kevin Hatten Hale and John Thomas Riley. These charges stemmed from the shooting death of the victim, Donald Walter Rhea, in August 2008. The Defendant was tried, alone, before a jury in December 2012, and the following proof was adduced:

Christina Weathers, the victim's daughter, spoke with the victim by phone at about noon on August 24, 2008. The victim's address was in McEwen, Humphreys County, Tennessee. Living with the victim was one of his sons, Christopher. Also living in a separate building on the property was Diane,[1] who had been dating the victim's eldest son, Donald Walter Rhea, Jr. The eldest son was incarcerated at the time.

Weathers spoke with the victim again that afternoon, and he told her that "[h]e was concerned that, since he made Diane and her kids leave, she was going to have someone come down there to kill him." Weathers knew Diane's sons as Boo and Gator.

Christopher Beggs, the victim's son, testified that he was eighteen years old on August 24, 2008. He lived with his father, the victim, in McEwen at the time. Diane had been living on the property for about six months. She lived in "a little one person house" that was located behind the trailer in which Beggs and the victim lived.

On August 24, 2008, the victim told Beggs that he wanted Diane to leave. The victim then went to speak with Diane about his wishes. Present during the conversation were Diane's sister, Cindy Anderson, Diane's school-age son, Austin, and Cindy's school-age son, Jordan. The Defendant also was present. Although Beggs did not hear the conversation, which took place in the small house where Diane was living, Beggs heard yelling. Beggs saw his father pull his pistol, and he ran around back to see what was going on. He heard the victim tell the other people to leave, that he wanted everyone "gone off" his property. Beggs saw Diane between the two men trying to break up the disagreement. Beggs stated that he did not see the victim strike Diane. Everyone except Beggs, the victim, and Diane left. This incident occurred at about two or three o'clock in the afternoon.

---

[1] The record later reflects that Diane's last name is Anderson. Because several of the witnesses in this matter bear the same last name, we will refer to them by their first names. We intend no disrespect.

Beggs stated that he had never seen his father so upset. He explained that the victim wanted Diane gone because he believed that Diane was using him. The victim did not like Diane's drinking or her constant visitors. On August 24, 2008, Beggs testified, "everybody was drinking that day, and [the victim] come [sic] home and everybody was just all over the house without his permission and he didn't agree with that," so the victim decided to tell Diane to leave.

About a half-hour after the confrontation, Beggs left and went to his friend Steven Lance's house, about five minutes away. Beggs and Lance went to Skeeter's, a small market nearby. While they were there, Gator, Boo, the Defendant, co-defendant Hale, Lacey Reynolds, and co-defendant Riley drove up. Beggs testified, "I told them, I was like, don't do anything to my dad. I just put that out there first because I thought after the confrontation there was ill feelings. So I was like, you know, don't hurt my dad whatever you do." Beggs was concerned about another confrontation because his father had earlier pulled a gun. According to Beggs, the Defendant responded, "[W]hat's wrong with your dad? Why would he pull a gun on me like that?" Beggs told him, "[Y]'all were drinking. You know, he doesn't like that." Beggs then heard a voice from the car say, "[Y]ou're Blood. Don't say anything."

Beggs left the market after about ten minutes and returned home. Gator, Boo, Lacey, the Defendant, Hale, and Riley drove up in one car. They all got out and walked to Diane's residence, passing behind the victim's home. Beggs told his father that the men were there, getting Diane. Beggs and his father were at the front of the trailer, the victim sitting on the steps leading to his bedroom. Beggs then saw Boo come around, and Boo yelled at the victim, "[W]hy did you hit my mom?" The Defendant, Riley, and Hale then appeared. Lacey and Diane were carrying clothes to the car. Beggs stated that "[e]veryone appeared to be a little irritated."

The Defendant, Hale, and Riley approached the steps. Beggs stated that the victim had several guns near him leaned up against the inside wall of the trailer, including a shotgun and a hunting rifle. The victim also had a pistol laying next to him. Beggs stated that the men exchanged some words, but he did not recall what was said. After the verbal interaction, Beggs saw the Defendant pass some garden tools to the other men, including some post-hole diggers, a shovel, and a pitchfork. These implements had been leaning up against the trailer. Beggs could see the Defendant's and Riley's hands. Beggs could not see Hale's hands because he had them under his shirt.

Beggs testified, "Once my dad seen [sic] they had the tools, he got up off his thing and pulled his gun and put it in [the Defendant's] face." The victim told the men to leave. Beggs continued, "Then after that, the other two rushed in and hit him with the pitchfork and he fell

3

inside." Beggs clarified that Riley hit the victim with the pitchfork. After the victim was down, the Defendant "ran in the house and was on him." Beggs heard a gunshot and "went in shock." The Defendant was in the trailer when Beggs heard the shot. Beggs thought he heard the Defendant say, "Oh, I'm shot," and then Beggs heard five more shots. Beggs testified that he saw Hale fire these five shots at the victim. The victim was lying inside the trailer when Hale shot him. The gun Hale used was one of the victim's. Beggs identified a hat that was found with the victim's body as one that the Defendant had been wearing at the time.

On further questioning, Beggs recalled that, when the men initially arrived, the Defendant told the victim, "[R]emember you pulled a gun on me earlier? Well, I got one now." He also recalled that the Defendant had had his hand under his shirt.

After Hale fired the five shots, the men ran to their car and left. Beggs called 911.

On cross-examination, Beggs acknowledged that his memory of the events was fresher when he gave his statements to law enforcement. In one of his statements, he said that the victim had "accidentally smacked" Diane. He acknowledged that he never saw either the Defendant or Hale with a pistol of their own. He also clarified that he heard the first gunshot when the Defendant knocked the victim's pistol out of the Defendant's face, and the victim's pistol went off. Hale then hit the victim in the face with the pitchfork, and the victim fell down into the trailer. The Defendant rushed the victim and was on top of him. Beggs did not see Hale go inside the trailer.

On redirect, Beggs explained that, after the victim fell, the Defendant was trying to wrestle the victim's gun away from him. The victim fired the gun and shot the Defendant. As the Defendant rose up, Hale shot the victim. The incident occurred around four or five o'clock in the afternoon.

Steven Lance, Beggs' friend, testified that he was seventeen years old in August 2008. A little after noon on August 24, 2008, Beggs came to Lance's house and picked him up. They drove to Skeeter's. After they had been there a little while, some people pulled up and spoke with them. He recalled "a dude named Kevin and a girl named Lacey and a boy named Gator." He did not know the other two people. He recognized the three individuals from having seen them previously at Beggs' house. He recalled hearing Beggs say, "[Y]'all don't come hurt my dad." He also recalled hearing yelling from the other car.

Lance and Beggs returned to Beggs' home and the other car also came to the trailer. The people in the car got out and went to the building behind the trailer. During this time, the victim was sitting on his steps. The victim seemed calm. After five or ten minutes,

4

Lance saw Lacey pick up a rock and walk toward the victim. He did not see Lacey throw the rock or hit the victim with it. Lance then saw Hale and two men he did not know approach the victim and make a circle around the steps. At this point, the victim stood up. Lance heard the group arguing. Some of the other men looked like they had their hands under their shirts. He recalled someone saying, "You pulled a gun on me earlier and now I have mine."

Lance stated that, when the victim stood up, he pulled his gun out and pointed it at someone. The person at whom the victim pointed his gun smacked the victim's gun away and the gun "misfired." At that point, Lance "took off running." He heard some more gunshots. From his vantage point, he saw Hale shoot the victim. The men then ran off, got in their car, and left.

Jerry Johnson, Jr. testified that his nickname was Gator, and his mother was Diane Anderson. He had three brothers, Billy Anderson, known as Boo, Austin Anderson, and Justin Johnson.[2] In August 2008, Gator was living with his father in West Nashville, but he visited his mother's residence at the victim's property on several occasions. He and Beggs were friends. Lacey Reynolds was Boo's girlfriend.

On August 24, 2008, Boo called him and told him that their mother had gotten into an argument with the victim and that Gator needed to go pick her up. Gator left his father's house and headed to his mother's house. On the way, he stopped and picked up the Defendant. Also in the car were Hale, Riley, Boo, and Lacey. They stopped at Skeeter's, and he spoke with Beggs and Lance. He told Beggs that he was going to get his mother. Beggs told him that the victim was angry with her.

Gator drove to the victim's property and they all got out. As Gator headed to his mother's residence, he saw the others standing around talking to the victim. As Gator was loading clothes baskets, he heard a gunshot. Gator "took off running." He heard one gunshot and then, a few seconds later, several gunshots "back to back." He ran to the car. When he got to the car, he testified, "Everybody was screaming saying that [the Defendant] was shot and that [the victim] had got shot." He told the Defendant to get in the car and he told Beggs to call 911. Gator drove off, trying to find a hospital. He was subsequently pulled over by law enforcement.

Gator testified that he did not see either the victim or the Defendant get shot. He stated that, after he heard the shots and was running for the car, he saw Hale throw a handgun into the woods. He also testified that he had told his friends that he, Gator, was going to be

---

[2] For ease of comprehension, we will refer to these persons by their first names or nicknames. We intend no disrespect.

5

the only one to get out of the car when they got to the victim's house.  He told them to stay in the car because they had told him what had happened earlier that day, and he "didn't want anything else to happen."  He said that everyone agreed to stay in the car but then got out after they arrived at the victim's property.  This conversation occurred after they left Skeeter's.

Diane Anderson testified that, as of August 2008, Boo and Lacey had been living with her behind the victim's trailer for about two months.  Hale also stayed with them.  No one was paying any rent to the victim and the victim was paying for the utilities.  She acknowledged that the situation was causing some "frustration."

On August 23, 2008, Diane went to Nashville to spend the night with her sister, Cindy Anderson.  The Defendant was Cindy's boyfriend.  On August 24, 2008, Cindy drove her back to the victim's property.  Accompanying them were the Defendant, Riley, Diane's son, Austin, and Diane's nephew, Jordan.  They dropped her off at about noon on the 24th.  On the way, Diane, Riley, and the Defendant were drinking beer.  When they arrived, Cindy asked to use the bathroom, and everyone got out of the car.  At that point, the victim "come [sic] around and got mad because [they] had all been drinking because he didn't like drinking down there."  The victim told her "to get the beer off the property," and the victim, Riley, and the Defendant began arguing.  The victim then "pulled a gun out" and told them to leave.  Cindy, Austin, and Jordan "took off running to the car."  Diane tried to stop the argument between the men.  The victim pointed his gun, a pistol, at the Defendant.  She told the Defendant and Riley to leave, and they did.

Diane decided to move in with Cindy.  She called Gator to come get her.  She did not know that anyone would be coming with Gator.  The victim had told her that he did not want the Defendant or Riley on his property again.  The victim had told her that, if the Defendant or Riley returned, he was "going to hurt one of them."

When Gator arrived, the Defendant, Riley, Boo, Hale, and Lacey were with him.  She testified that, at this point, the victim was sitting on his steps, "waiting.  He had his – he thought they were going to kill him, so he had his gun loaded.  He had two guns – two big guns loaded, and then he had a little one loaded."  The Defendant, Riley, and Hale began bickering with the victim.  As Diane was in the back collecting her things, she heard gunshots.  She ran around and saw that the Defendant had been shot in his stomach.  They all ran to the car.  She asked about the victim, and Hale told her, "I shot him."

Lacey Reynolds testified that she had been dating Boo in August 2008.  On August 24, 2008, Boo woke her up and told her that they needed to go get his mother.  He told her that his mother had been "beat up," and Boo was angry about it.  She and Boo left with Gator

and Hale.  On the way, they stopped and picked up the Defendant and Riley.  They also got some beer on the way.  At Skeeter's, Beggs flagged them down.  Beggs told them not to go down there and start any trouble with his father.  Hale told Beggs "that [the victim] had fucked up and he was going to get fucked up."

They drove to the victim's property.  Everyone got out of the car, and Lacey walked back to Diane's residence and got some clothes.  She returned to the car and put them in the trunk.  The Defendant, Riley, and Hale were talking to the victim in front of the victim's house.  She picked up a rock because she was scared.  She saw Riley or the Defendant pick up a couple of garden tools and pass one of them to the other.  She testified, "At that point, [the victim] took out a pistol and pointed it at [the Defendant] and he hit it and the gun fire went off."  She ran and heard more shots.  When they all got to the car, she saw that the Defendant had been shot.  She did not see the victim get shot.  She stated that no one in the car had taken a gun to the victim's property.

On further questioning, Lacey recalled that, while they were talking to Beggs at Skeeter's, the Defendant stated that he was going to "eff up" the victim.  She also recalled Hale telling Beggs to "shut up because he was a Blood."

Cindy Anderson, Diane Anderson's sister, testified that Diane spent the night with her on August 23, 2008, and Cindy drove her back to the victim's property the next day.  With them were the Defendant, Riley, Austin, and Jordan.  When they arrived, everyone got out of the car.  The victim and Diane began arguing about Diane's drinking.  The Defendant asked the victim if the victim had a problem with Diane being there, and the victim "just come [sic] out with the gun."  The victim pointed the handgun at the Defendant and said "he would shoot him between his eyes."  The Defendant told the victim that "he didn't have the balls to do it."  The victim repeated that he would shoot the Defendant.  Cindy got everyone except Diane back to the car and they left.

Later, Boo called and spoke with the Defendant, "[s]aying that [the victim] was beating up on his mama and that they were going back to get her and wanted us to meet them at Walmart so that [the Defendant] and John Riley could go with them."  The Defendant relayed this information to Cindy, and Cindy dropped the Defendant and Riley off at the Walmart.

Deputy Casey Grove of the Dickson County Sheriff's Office ("the DCSO") responded to the scene.  Deputy Bruso was already there and paramedics were on the way.  Deputy Grove saw the victim lying in the trailer at the doorway.

7

Sergeant Jeff Lovell of the DCSO responded and pulled over the vehicle which had been reported as leaving the scene. The Defendant told Sgt. Lovell that he had been shot, and he subsequently was transported to the hospital.

Detective Brent Johnson with the DCSO responded to the scene of the vehicle. He photographed and searched the car. He did not find any weapons in the car.

Jennifer Jones, a paramedic, responded to the victim. She found no pulse. She identified a photograph of the victim taken at the scene as he was found. This photograph depicts the victim's body lying inside the trailer near the doorway. Jones observed what appeared to be three gunshot wounds to the victim's torso.

Agent Joe Craig of the Tennessee Bureau of Investigation ("the TBI") reported to the scene to assist in the investigation. He collected a 30.06 deer rifle, a 20-gauge shotgun, a .32 caliber handgun, and a .38 caliber handgun. He later determined that the Defendant had been shot with the .32 caliber handgun and that the gun had been shot twice. He also found a second .38 caliber handgun lying outside in a wooded area. This gun had five empty casings in it.

During his investigation, Agent Craig moved the victim's body and found an earring underneath. He later determined that this earring was consistent in appearance with an earring the Defendant was wearing in his driver's license photograph.

Agent Alex Brodhag of the TBI testified that he was a firearms examiner. He examined a .38 caliber revolver, five fired .38 cartridge cases, and five fired .38 caliber bullets. He determined that the five fired bullets, which were collected from the medical examiner's office, had been fired through the .38 revolver.

Agent Brodhag also examined a .32 caliber revolver, four unfired .32 caliber cartridges, and two fired .32 caliber cartridges. He determined that one of the fired cartridges had been fired from the revolver. His results as to the other fired cartridge were inconclusive.

Agent Brodhag also examined a black T-shirt that had been recovered from the victim and a blue T-shirt that had been recovered from the Defendant. There were three holes in the left sleeve of the victim's T-shirt. Testing revealed that there was gunshot residue around the holes in the victim's T-shirt and that the .38 caliber revolver left residue if shot within a distance of four to five feet.

Agent Brodhag found a bullet hole in the front left side of the Defendant's T-shirt and lead residue around the hole. The shape of the hole led him to conclude that it resulted from a contact shot.

Dr. Bridget Eutenier, a forensic pathologist with the Office of the Medical Examiner in Nashville, testified that Dr. Stacy Turner, formerly of the Medical Examiner's Office, had performed the autopsy on the victim. Dr. Eutenier was familiar with the autopsy report that Dr. Turner prepared. The report provided that the victim had suffered multiple gunshot wounds and that five projectiles were recovered from the victim's body. Four gunshot wounds to the victim's torso could each have been fatal. Thus, the cause of the victim's death was multiple gunshot wounds.

The State rested its case-in-chief after Dr. Eutenier's testimony.

The Defendant testified that he was thirty-two years old. In August 2008, he was living with Cindy Anderson at her house. Diane spent the night of August 23, 2008, with them. At about noon on August 24, 2008, he and Cindy drove Diane back to her residence. With them were Jordan and Riley. When they dropped Diane off, she and the victim "got into an altercation." The Defendant had not met the victim previously. He stated that he saw the victim "smack" Diane. The Defendant asked the victim if he had a problem with Diane being there. The victim pulled out his gun, "waved it around, and told everybody to get off of his property." The Defendant stated that he and Riley "exchanged a few words" with the victim, but he did not recall what was said. On the way back to West Nashville, Boo called and asked for their help in moving Diane out. Cindy dropped him and Riley off at the Walmart in West Nashville, and they were then picked up by Boo and Gator and Hale and Lacey.

Beggs flagged them down at Skeeter's. The Defendant testified that, there, "[w]ords were exchanged between Kevin Hale and Mr. Beggs." He remembered Beggs saying, "don't hurt my father," but he did not recall what Hale said. He testified that he did not say anything.

When the Defendant got to the victim's house, he saw the victim sitting in a doorway with his feet on the steps. He told the victim that they were there to get Diane's belongings, that they weren't looking for any trouble, and that they would be gone after they got her things. According to the Defendant, the victim "immediately jumped up and put a gun in [his] face and told [him] that he would blow [his] effing brains out." The Defendant pushed the gun out of his face and the two men fell over. The gun discharged as he was pushing it away. The Defendant testified: "I fall down on top of him, and I'm trying to wrestle him to make sure he doesn't get the gun close enough to shoot me and kill me." During the

9

struggle, the Defendant was shot. After being shot, all the Defendant remembered was Riley pulling off his shirt for a compress and Riley and Boo helping him to the car. He did not recall hearing five shots. He was subsequently flown to Vanderbilt Hospital.

The Defendant denied that there was any talk about attacking or hurting the victim in the car during the second trip to the victim's property.

On cross-examination, the Defendant denied picking up any garden tools and handing them to his cohorts. He denied that he intended to assault the victim. He maintained that he "went there just for support for Boo and Gator."

Based on this proof, the jury convicted the Defendant of the lesser-included offense of criminally negligent homicide on the original charge of first degree premeditated murder. The jury convicted the Defendant as charged of first degree felony murder and aggravated burglary. The trial court sentenced the Defendant to life imprisonment and then merged the convictions of criminally negligent homicide and aggravated burglary into the Defendant's conviction of first degree felony murder. This appeal followed, and the Defendant seeks to have his conviction of first degree felony murder reversed on the basis of insufficient evidence. The State seeks reinstatement of the Defendant's aggravated burglary conviction.

## **Analysis**

### *Sufficiency of the Evidence*

The Defendant was convicted of first degree felony murder in the perpetration of, or attempt to perpetrate, an aggravated burglary. See Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2008). An aggravated burglary, as charged in this case, is committed when a person enters a habitation without consent and with the intent to commit an assault. See id. §§ 39-14-403(a), -402(a)(3) (2006). "Habitation" "[m]eans any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons" and "[i]ncludes each separately secured or occupied portion of the structure . . . and each structure appurtenant to or connected with the structure." Id. § 39-14-401(1)(A), (1)(C) (2006). An assault, as the jury was instructed in this case, is committed when a person "[i]ntentionally, knowingly or recklessly causes bodily injury to another." Id. § 39-13-101(a)(1) (2006). Additionally, one criminal actor can be held criminally liable for the criminal acts of his cohort – in this case, Hale's shooting of the victim – when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2) (2006).

10

The Defendant contends that he lacked the requisite intent to commit an assault and that his "actions were in self-defense – nothing more." He asserts that "[o]nly after the gun was pushed into [his] face did [he] or others make any sort of physical assault on [the victim]" and that he did not enter the victim's habitation with the intent to commit an assault.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted).

This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Viewing the evidence in the light most favorable to the State, as we are bound to do, we hold that the evidence was sufficient to support the Defendant's conviction of first degree felony murder in the perpetration of, or attempt to perpetrate, an aggravated burglary. The evidence established that, earlier in the day, the Defendant and the victim had a confrontation during which the victim pulled a gun and threatened the Defendant. The Defendant taunted the victim that he, the victim, did not have "the balls" to shoot the Defendant. Later in the day, knowing that the victim was armed, the Defendant returned to the victim's residence and confronted the victim as the victim sat on the steps fronting the open doorway to his bedroom. The Defendant challenged the victim saying, "Remember you pulled a gun on me earlier? Well, I got one now." The Defendant also took some of the victim's garden tools and passed them to his cohorts, effectively arming them.

As the Defendant might reasonably have anticipated, his actions provoked the victim into pulling his gun and aiming it at the Defendant. Instead of retreating, the Defendant knocked the gun out of his face, and Hale then knocked the victim back into the victim's bedroom. The Defendant, rather than running away from an armed man, went after the victim and landed on top of him. That is, the Defendant entered the victim's habitation and began struggling with the victim. This struggle soon resulted in the victim shooting the Defendant and Hale shooting the victim.

That the Defendant approached the victim already intending to cause bodily injury to the victim is apparent from the Defendant's actions in provoking the victim and arming his cohorts. The Defendant clearly was seeking an excuse to "eff up" the victim, as he stated he was going to do while still at Skeeter's. Once he had provoked the victim into aiming his gun at him, the Defendant began his physical assault by striking the victim's hand. After his cohort then knocked the victim into the victim's home, the Defendant pursued the victim into the residence and began a physical struggle with the victim. Accordingly, we hold that the evidence was sufficient to support the Defendant's conviction of first degree felony murder committed in the perpetration of an aggravated burglary. The Defendant is entitled to no relief on this basis.

*Merger of Aggravated Burglary Conviction*
*with First Degree Felony Murder Conviction*

The record reflects that, after the jury returned its verdict, the trial court sentenced the Defendant to life in prison. The prosecutor then asked, "I believe Count One and Count Two would merge?" The trial court responded, "Yes. That [sentence of life imprisonment] was on Count Two. Count One and Three would merge into Count Two." The conviction entered on Count One was criminally negligent homicide. The conviction entered on Count Three was aggravated burglary. The State lodged no objection to the mergers. The trial court subsequently entered judgments of conviction on each count, and indicated at the bottom of the judgment order entered on Count Three, "Count 3 merges with Count 2."[3] The State now asks us to recognize the trial court's merger of the aggravated burglary conviction as plain error and to reinstate that conviction and remand for sentencing on that conviction. In his reply brief, the Defendant argues that State v. Bise, 380 S.W.3d 682 (Tenn. 2012), applies to protect him from this Court reinstating his conviction of aggravated burglary.

Initially, we note that our supreme court has made clear that double jeopardy principles permit convictions of both felony murder and the underlying felony. See, e.g.,

---

[3] The trial court also indicated at the bottom of the judgment order entered on the criminally negligent homicide conviction that "Count 1 merges with Count 2."

12

State v. Blackburn, 694 S.W.2d 934, 936-37 (Tenn. 1985). Accordingly, the trial court clearly erred when it ordered the merger of the Defendant's aggravated burglary conviction into his conviction of first degree felony murder.

Tennessee's Rules of Appellate Procedure provide that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of *a party* at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b) (emphasis added). In the context of criminal jurisprudence, this level of error is referred to as "plain error." See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). Before an appellate court may grant relief on the basis of plain error, five prerequisites must be satisfied: (1) the record must clearly establish what took place in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the complaining party must have been adversely affected; (4) the complaining party did not waive the error for tactical reasons; and (5) review of the error is necessary to do substantial justice. Id. (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The Defendant has cited us to no authority, and we are aware of none, that limits the application of the plain error doctrine to errors claimed by a defendant. Accordingly, we will consider whether the State is entitled to plain error relief from the trial court's merger of the Defendant's conviction of aggravated burglary into his conviction of first degree felony murder.

First, as set forth above, the record clearly establishes what occurred in the trial court. Second, we are aware of no legal basis for the merger of the Defendant's conviction for aggravated burglary into his conviction for first degree felony murder. Thus, we deem the second plain error prerequisite satisfied. Third, the State's right to have the Defendant sentenced for his conviction of aggravated burglary was violated by the trial court's erroneous merger. We deem this right to be substantial and that, as a result, the third plain error prerequisite is satisfied. Fourth, we can conceive of no tactical reason for the State to have waived its objection to the trial court's erroneous merger. We only can presume that the prosecutor failed to appreciate the trial court's action at the time. Therefore, we deem the fourth plain error prerequisite satisfied. Fifth and finally, consideration of the erroneous merger is necessary to do substantial justice. The jury convicted the Defendant of aggravated burglary. The evidence was sufficient to support this conviction. The trial court's erroneous merger of this conviction deprives the State of the benefit of the jury's verdict. Accordingly, we deem the fifth plain error prerequisite satisfied.

The Defendant's reliance on Bise in response to the State's argument is misplaced. Bise addresses the effect of a trial court's misapplication of enhancement or mitigating factors, 380 S.W.3d at 706, and the standard of review that appellate courts should utilize in reviewing a trial court's sentencing decisions. Id. at 707. Because the trial court never

13

sentenced the Defendant for his aggravated burglary conviction,[4] <u>Bise</u> is simply inapposite.

In sum, we have determined that the State has demonstrated that the trial court committed plain error when it merged the Defendant's conviction of aggravated burglary into his conviction for first degree felony murder. Therefore, we order the trial court to reinstate the Defendant's conviction of aggravated burglary, to conduct a sentencing hearing relevant to this conviction, and to impose sentence accordingly.

## CONCLUSION

We affirm the Defendant's conviction of first degree felony murder. We remand this matter for the trial court to reinstate the Defendant's conviction of aggravated burglary and to sentence the Defendant thereon.

_____
JEFFREY S. BIVINS, JUDGE

---

[4] We reject the Defendant's argument that a merged conviction is the equivalent of a concurrent sentence.